Filed 4/8/26  In re M.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.C.,<br><br>        Defendant and Appellant. | E086695<br><br>(Super.Ct.No. J305081)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Affirmed.

Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Lara Feingold, County Counsel, and Kristina M. Robb, Deputy County Counsel for Plaintiff and Respondent.

Defendant and appellant T.C. (father) challenges juvenile court jurisdictional findings, arguing there is no substantial evidence that he has a history of substance abuse that placed his daughter at substantial risk of serious physical harm (Welf. & Inst. Code,[1] § 300, subd. (b)(1)), or that he sexually abused her (*id.*, subd. (d)). He also argues the juvenile court abused its discretion by terminating the dependency with exit orders denying him any visitation. We affirm.

FACTS

Father has two daughters, the child at issue in this case, M.C. (born 2017), and her older half-sister P.D. (born 2013). As of March 2025, father's household included his mother (paternal grandmother), but neither of the children's mothers.

In March 2025, plaintiff and appellant San Bernardino County Children and Family Services (department) investigated a report the children were being physically and emotionally abused when they were with father. M.C. had said father "hits her with a hairbrush while he is doing her hair," which P.D. confirmed to law enforcement. When the children demonstrated how father hits M.C., "it appeared to be a 'stop squirming' type of hit with a hairbrush." Also, father had whipped P.D. in the calf with a wet towel, leaving a red mark. Father told law enforcement he had whipped the towel in the air as a joke and accidentally hit P.D., but he consoled her afterwards. Father was not arrested; the investigating law officer planned "to long form a misdemeanor charge" but

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

"assume[d] that nothing will come of these charges." In family court, however, M.C.'s mother (mother) sought and was granted a temporary restraining order against father on March 7, 2025. On March 28, 2025, the family court ordered the restraining order "to continue" and granted mother sole legal and physical custody; father was granted twice-weekly supervised visitation.

In March 2025, a social worker observed father "has marijuana all over the house" in mason jars that were within reach and "not secured from the children." There was "no concern . . . that the children are smoking marijuana." M.C., however, said father "smokes a lot in the house," that he smokes "something that 'looks like broccoli and smells really bad,'" and that he "smokes out of a glass bottle." She said father smokes in bed, but "aims it away from" the children. She said the paternal grandmother also smokes.

In May 2025, P.D. reported inappropriate sexual conduct by father. P.D. said father would shower with M.C., during which he would touch or wash M.C.'s genitals, and M.C. would scream and cry. P.D. said father "has an ongoing request to take a shower with her as well." She said father showed them "inappropriate pictures of himself," and would walk around the house naked. He would talk to the children about sexual topics, such as "masturbating and what happens when males get excited," and he asked P.D. whether she "has grown any 'pubes' yet." The children were not allowed to shut the door to the bathroom when showering or using the toilet; if they did, father "would barge in and demand that the door be open." On May 7, 2025, during a

3

supervised visit, father gave the children a note that said "his bed is calling for them," and that "he misses wrapping [them] in towels after their baths and cuddling with them." P.D. also said father repeatedly tried to kiss the children on the lips and tried to hug them even though they told him they did not feel comfortable doing so. M.C.'s mother made an ex parte request in family court, and after a May 13, 2025 hearing, father's visits were suspended.

Also in May 2025, the department received a report of sexualized behavior by M.C. while at school. A child disclosed that on more than one occasion, most recently a month earlier, she, another girl, and M.C. entered a bathroom stall together and were "kissing each other on the mouth and touching each other's private parts" with clothing on.

Father told a social worker that he stopped showering with M.C. when she was five and a half years old, and he denied P.D.'s allegations about what happened during showers with M.C. He said paternal grandmother would help the girls with showers or shower with them, but if they "are not comfortable then they do not shower with anyone." The paternal grandmother told the social worker the girls "will tell her 'no, grandma, I'll do it myself' or she will hop in the shower, and they will hop in after." Father denied walking around the home naked, but "reported they are a 'comfortable family.'" He said they do all leave doors open, but he denied telling M.C. and P.D. that they had to do so. He denied showing the children inappropriate pictures or talking to them inappropriately about sexual topics. He said that he and paternal grandmother had

seen M.C. masturbating sometimes, beginning when she was about two years old, and when she was about four years old, they spoke to her about it, and "when [M.C.] would masturbate they would tell her to go to her room."

During a June 2025 home visit, a social worker observed father's marijuana was in a locked box inside the garage, out of reach of the children. Alcohol, too, was on a top shelf, out of reach of the children. Father told the social worker "he smokes marijuana every day before bed." He said he "has the marijuana locked up," that he does not smoke it in front of the children, and that he smokes "outside or in the garage." Father agreed to drug test in June 2025, and the result was positive for marijuana.

Both in an interview summarized in a police report and in a later forensic interview, M.C. said father would make her shower with him, even when she said she did not want to. She said he would "wash her 'chi chi's,'" even though she "kept telling [him] to stop." She said he would "wash 'inside my vagina' and 'inside of my butt.'" Her descriptions of exactly what she meant by that varied some, and were ambiguous in some respects, but she seemed to indicate he would use a flat hand and rub back and forth on her clitoris and other external genitalia, as well as her anus.[2] She said father did not

---

[2] In the forensic interview, "[M.C.] was asked if she could show what she meant by inside and she reported [father] used two to three fingers and demonstrated by using two fingers and going up. [She] stated it would feel weird. . . . [She] stated [father] only had water on his hands. [She] stated [father] would use three to four fingers to wash her butt and reported it felt weird. [She] stated [father's] fingers were 'flat.' [She] denied [father] putting fingers inside her butt." In the police report, the officer recorded her saying that when she was five to six years old, father "'would force her to shower with him before bedtime in his bedroom shower.'" When asked to describe exactly how father touched her using a drawing, she "'pointed to the clitoris and said his fingers went front

*[footnote continued on next page]*

"let her wash his body" except "only his toes because she wanted to," and she described his penis as being "soft and hairy." She told the social worker the last time she showered with father was when she was six or seven years old; father stopped after she told him "'please stop right now or I am going to have mom call the police.'"

When confronted with the allegations regarding showers with M.C., father said "'it's a lie.'" He said "he would shower [M.C.] when she was younger because they don't know how to wash themselves," but that he stopped "when they were five and a half years old." He said he "could not believe what was being alleged and expressed 'these are my little lovers,'" and said he "feels sick even thinking of" the allegations.

On July 1, 2025, the department removed M.C. from father's care and maintained her in mother's care. M.C.'s dependency petition alleged she came within section 300, subdivisions (b)(1) (failure to protect), based on father's history of substance abuse, and (d) (sexual abuse), based on "acts of abuse" by father including but not limited to "putting two to three fingers inside the child's vagina."[3] At the detention hearing, the juvenile court detained M.C. from father and ordered no contact between father and M.C., finding visitation would be detrimental to her physical or emotional well-being.

---

and back for a couple of seconds fast.'" P.D. also told the officer she saw M.C. showering with father. She described hearing M.C. crying and seeing father's "hand going from front to back in a fast motion on [M.C.'s] vagina as if he was washing it."

[3] Allegations against mother under section 300, subdivision (b)(1), based on failure to protect M.C. from father, were initially included in the petition but later dismissed. They are not at issue here.

6

In the August 2025 jurisdiction and disposition report, the department recommended that the allegations against father be found true, that M.C.'s mother, previously the non-custodial parent, be granted custody, and that the dependency be dismissed. The report repeated the abuse allegations from the dependency report. In a July 31, 2025 interview with a social worker, M.C. rated her feelings of safety when she was in father's care on a scale of one to 10, saying "'she felt 'a one' meaning she felt 'very unsafe' when she was in the father's home." She felt unsafe because father "touched her inappropriately, smoked weed, and he hit her half-sister . . . with a towel." She said father "would smoke 'weed' in the kitchen while she and [P.D.] were in the living room, which was the next room over." She said father hit [P.D.] with the towel because he was angry. She did not want to visit with or see father, and had been "'pretty happy'" she had not had to do so recently. Regarding mother's home, she "reported feeling a 'ten' on the scale of safety." She "asked the judge be informed '[I'm] pretty happy here [in the mother's home] and I do not want to see my dad.'"

When father spoke to a social worker in August 2025, he "presented as confrontational and he asserted the court, judge, and CFS were discriminating against him because he is 'a black, single male.'" He proposed that M.C. was being "'coached'" by mother to make the allegations, he questioned why he should make another statement "'if you're just going to believe [M.C.] anyway," and stated "'I just really care about my daughter's hygiene.'" Father had also been "inappropriate in his interactions with CFS

staff" on multiple previous occasions, sending profane text and audio messages attacking social workers' qualifications and personal integrity.

At the jurisdiction and disposition hearing on August 13, 2025, father's counsel objected to the allegations but offered no affirmative evidence. The juvenile court sustained the jurisdictional allegations against father. It removed M.C. from father, granted mother sole physical and legal custody, and terminated jurisdiction. The court's family law orders allow contact between M.C. and father "in a therapeutic setting if deemed appropriate by the family law court," but grant father no visitation.

## DISCUSSION

Father argues (1) no substantial evidence supports the court's jurisdictional finding based on his marijuana use, (2) no substantial evidence supports the jurisdictional finding of sexual abuse, and (3) the juvenile court abused its discretion by denying him visitation. We are not persuaded by any of these arguments.

### A. *Substance Abuse Finding*

Father does not dispute that he *uses* marijuana, contesting only that his use constitutes *abuse* or puts M.C. at a substantial risk of serious physical harm. While the evidence is not overwhelming, we disagree with father's view that no substantial evidence supports the juvenile court's finding.

The Legislature has declared "[t]he provision of a home environment free from the negative effects of substance *abuse* is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2, subd. (a) (italics added).)

8

Nevertheless, a parent's drug *use* alone cannot support juvenile court jurisdiction. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 765.)

Section 300, subdivision (b)(1), authorizes a juvenile court to assert jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child." The burden is on the agency to demonstrate the following three elements by a preponderance of the evidence: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) Thus, the department "must establish, as separate elements, that (1) substance abuse (2) makes a parent . . . unable to provide regular care for a child and (3) this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 558.) The term "substance abuse" in this context carries "its ordinary meaning— essentially, the excessive use of drugs or alcohol." (*Id.* at p. 531.)

Although section 300 generally requires proof that the child is subject to the defined risk of harm at the time of the jurisdictional hearing (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court may consider past events in deciding whether a child currently needs the court's protection. (*Ibid.*) A parent's "'[p]ast conduct

may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Viewed in this deferential light, we find the evidence sufficient to support the juvenile court's substance abuse finding. Father admittedly uses marijuana daily. He said his use is limited to "before bed," outside or in the garage and out of the presence of the children. M.C.'s statements, however, give ample basis to believe that father was not being truthful: she described him smoking marijuana "a lot," and not just before bed. It was reasonable for the juvenile court to infer that father substantially understated both the amount and the circumstances of his marijuana use, and that in fact he was abusing it in the ordinary meaning of that term.[4] Furthermore, M.C.'s statements support the

---

[4] We set aside, for present purposes, the question of whether daily marijuana use before bed might, without more, reasonably be viewed as constituting abuse.

10

conclusion that this included smoking marijuana in the presence of the children. There is no particular event, such as an arrest for driving while impaired, that unambiguously ties father's marijuana usage to a risk of physical harm to M.C. Nevertheless, on one occasion, the social worker personally observed marijuana in mason jars "all over the house" and within reach of the children. It also was reasonable for the juvenile court to infer that excessive marijuana use while caring for the children had exacerbated father's other inappropriate behavior, so M.C. was correct to view father's marijuana use as a reason to feel unsafe in his care. These facts support the trial court's conclusion marijuana usage was interfering with father's ability to provide regular care to M.C. and posed a substantial risk to her physical safety. Father's arguments to the contrary rest on his self-serving account of his behavior, which the trial court was not required to accept, and which we may not accept in the present procedural posture.

B. *Sexual Abuse Finding*

Father argues no substantial evidence supports the trial court's finding that he sexually abused M.C. In his view, it is "clear" that he touched M.C. "for the purpose of cleanliness and hygiene," which is a "'normal caretaker responsibility,'" and there is no evidence he touched her "for a sexual purpose." He argues also that there is no evidence his "fingers actually penetrated [M.C.'s] vagina." These arguments are without merit.

A child comes within the juvenile court's jurisdiction under section 300, subdivision (d), if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by

11

[his or her] parent . . . ." Penal Code section 11165.1 defines "sexual abuse" to mean "sexual assault or sexual exploitation," and its subdivision (a) lists a number of offenses that qualify. Most of those offenses involve physical touching, child trafficking/prostitution, or pornography. Penal Code section 11165.1, subdivision (b), defines "sexual assault" to include "[i]ntrusion by one person into the genitals or anal opening of another person . . . except that, it does not include acts performed for a valid medical purpose." (*Id.*, subd. (b)(3).) "Sexual assault" also includes "[t]he intentional touching of the genitals or intimate parts . . . of a child, . . . for purposes of sexual arousal or gratification, except that it does not include acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose." (*Id.*, subd. (b)(4).)

There is ample record evidence supporting the trial court's sexual abuse finding. M.C.'s statements about being forced to shower with father and describing his actions during those showers are substantial evidence of sexual assault. The trial court could reasonably have inferred that there was some amount of "intrusion" into her genitals, even if some of her comments may indicate father touched her only externally. (See Pen. Code, § 11165.1, subd. (b)(3).) And, even without penetration, M.C.'s description of vigorous rubbing focused on the clitoris is reasonably viewed as evidence of intentional touching for purposes of sexual arousal or gratification. (*Id.*, subd. (b)(4).)

12

This interpretation of father's actions during showers with M.C. is further supported by his other conduct, including showing the girls inappropriate pictures of himself, making comments and asking questions on sexual topics, demanding that they keep the bathroom door open while they use the toilet or shower, insisting on kissing them on the lips and hugging them even when they told him they did not want to, and referring to them as his lovers. This other conduct provides circumstantial support for the conclusion that father's behavior during showers with M.C. was not an exercise of normal caretaker responsibilities. The court was under no obligation to accept father's denials of inappropriate behavior or characterization of his actions as being motivated by concern for hygiene and cleanliness. Again, at most, father has shown arguable conflicts in the evidence, not any lack of substantial evidence to support the juvenile court's finding.[5]

C. *Visitation*

Father argues the trial court abused its discretion by issuing family law orders denying him visitation. We find no abuse of discretion.

When a juvenile court terminates its jurisdiction over a dependent child, it "may issue . . . an order determining the custody of, or visitation with, the child," often referred to as an exit order. (§ 362.4, subd. (a); *In re Anna T.* (2020) 55 Cal.App.5th 870, 871.) "Such orders become part of any family court proceeding concerning the same child and

---

[5] Because we will affirm both of the challenged jurisdictional findings, we do not address the parties' arguments about what should be done if we reverse one or both of them.

will remain in effect until they are terminated or modified by the family court." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) "The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests." (*In re J.M.* (2023) 89 Cal.App.5th 95, 112.)

"We review a custody (or 'exit') order pursuant to section 362.4 for abuse of discretion, and will not disturb the order 'unless the court """exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."""" (*In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.)

There was nothing arbitrary, capricious, or patently absurd about the juvenile court's decision not to grant father any visitation with M.C. As discussed, the court's findings about both substance abuse and sexual abuse were supported by substantial evidence. Father's behavior toward the children had been inappropriate at times, even during supervised visitation. The trial court thus had ample reason for concern that further contact with father, even in a supervised setting, could be traumatic for M.C. Father had shown no understanding that his behavior had been inappropriate, from which it is reasonably inferred that the inappropriate behavior would continue. And M.C. unambiguously expressed that she did not want to visit with father. (See *In re Julie M.* (1999) 69 Cal.App.4th 41, 51 ["a child's aversion to visiting an abusive parent may be a 'dominant' factor in administering visitation" though it may not be "the *sole* factor"].) The juvenile court's finding that it was in M.C.'s best interests to deny father any visitation was well within the bounds of its discretion.

DISPOSITION

The jurisdictional and dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
J.


We concur:

MILLER_____
Acting P. J.

CODRINGTON_____
J.

15